J-A28015-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: R.B.S., JR., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.B.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 858 MDA 2021 |

Appeal from the Decree Entered May 27, 2021
In the Court of Common Pleas of Mifflin County Orphans' Court at No(s):
2020-00011


BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED:  MARCH 15, 2022**

R.B.S. (Father) appeals from the decree, entered in the Court of Common Pleas of Mifflin County, Orphans' Court Division, involuntarily terminating his parental rights to R.B.S., Jr. (Child) (born 12/10),[1] pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b) of the Adoption Act.[2]   After careful review, we affirm based on the opinion authored by the Honorable Aaron L. Gingrich.[3]

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The court also terminated Mother's parental rights to Child.  Mother's appeal is docketed at 812 MDA 2021.

[2] 23 Pa.C.S.A. §§ 2101-2938.

[3] Guardian *ad litem*, Erica J. Shoaf, did not file a brief, stating she supported the brief filed by Appellee Mifflin County Children and Youth Services (Agency). **See** Letter, 10/15/21.  Child was also represented at the hearing by Brian R.
*(Footnote Continued Next Page)*

The family has a history with the Agency pertaining to concerns of domestic and sexual abuse, drug use, lack of supervision and other safety concerns. On December 1, 2017, following Mother's arrest with three of her four children in the car with her, and Father testing positive for cocaine, Child and his three siblings were adjudicated dependent and placed in the custody of the Agency. *See* Dependency Order of Adjudication, 12/1/17.

In his opinion, Judge Gingrich sets forth the history of this case:

[Child] has a diagnosis of Post-Traumatic Stress Disorder [PTSD]. [Child's] mental health has deteriorated throughout the duration of this case. The underlying facts of [Child's] PTSD are hard to discern. [Child] alleges that Father sexually abused him and his siblings, which has led to many of [Child's] mental health issues throughout this case. These allegations were [deemed] unfounded by the Agency. However, through extensive testimony, [Child] has witnesse[d], and potentially been subject[ed] to, domestic violence at the hands of [] Father. Additionally, [Child] has special education services and an individualized education plan [(IEP)] through the school. [Child] has significant mental health concerns[,] which has caused him to move placements three times during the course of this case.

_____

Baker, Esquire. *See In re: Adoption of L.B.M.*, 161 A.3d 172, 180 (Pa. 2017) ("[W]hen a child's relationship with his or her birth family could be severed permanently and against the wishes of the parents, the legislature made the policy judgment, as is evidenced from the plain, unambiguous language of the statute, that a lawyer who represents the child's legal interests, and who is directed by the child, is a necessity."). As our Court has explained, a child's legal interests are distinct from his best interests. *In re: Adoption of L.B.M.*, 161 A.3d at 174. Representing the child's "'[l]egal interests denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation," while guardian *ad litem* discerns the child's best interests; in each case, these interests are ultimately determined by the orphans' court." *In re: Adoption of K.M.G.*, 240 A.3d at 1243 n.20 (quoting *In re: T.S.*, 192 A.3d at 1082 n.2 (quoting Pa.R.J.C.P. 1154, cmt.)); *see also In re: Adoption of L.B.M.*, 161 A.3d at 174 n.2.

[Child] struggles with suicidal ideation, violent outbursts, and goes to trauma therapy weekly.

[] Mother and Father had an incredibly tumultuous relationship. Mother testified that the relationship was abusive and co-dependent, and both Mother and Father struggled with drug use. Additionally, there were allegations of physical and sexual abuse by Father toward both Mother and the children. [ ] Father vehemently denies the allegations that he ever sexually abused his children, and no criminal charges have ever been filed against Father for the alleged sexual abuse of [Child] or [Child's] three siblings. . . . Father's visits were suspended [on December 17, 2019] due to the allegations of sexual abuse, and due to Father being incarcerated.

Trial Court Opinion, 5/24/21, at 1-3.

Following the dependency adjudication, the Agency developed a Child Permanency Plan, which included the following parental objectives for Father: live a crime and drug-free lifestyle; maintain stable housing and income; ensure mental health needs are met through counseling and medication management; demonstrate parenting skills necessary to meet Child's emotional, developmental, and physical needs; and cooperate with Agency and service providers. Although Father's visits with Child were suspended on December 17, 2019, due to the abuse allegations, the Agency continued to provide services to Father.

Father was able to maintain housing and employment, however he was incarcerated twice throughout the dependency proceeding, refused 21 of 28 drug screens, and tested positive for cocaine on January 9, 2019. Despite a three-year effort by the Agency and Families in Crisis Services (FICS), Father's progress was "minimal" throughout dependency. Notably, Father attended

only 6 of 39 parenting education sessions and 12 out of 40 counseling sessions. Once incarcerated, Father attended all scheduled sessions. After his release, however, Father attended only 17 of 28 sessions. **See** N.T. Termination Hearing, 3/10/21, at 320-31. The Agency petitioned for termination of Father's parental rights on June 4, 2020. After September 5, 2020, Father failed to attend any counseling or parenting sessions, complaining that they cut into his "me" time. **Id.** at 320-21.

At the termination hearings on February 2, 2021, and March 10, 2021, the court heard testimony from Agency assistant director, Nicole Patkalitsy, Dr. Kristen Hennessy, Child's treating psychologist and expert in childhood trauma, David G. Ray, a licensed psychologist, and Darlene Griffith, a family counselor at Family Intervention Crisis Services (FICS), who provided reunification services to both Father and Mother. Following the hearings, the court terminated Father's parental rights to Child.[4]

---

[4] The relevant grounds for termination, as set forth 23 Pa.C.S.A. § 2511, are as follows:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

*(Footnote Continued Next Page)*

On appeal, Father raises one issue: "Whether [Father] will be able to remedy the conditions causing his current incapacity?" Appellant's Brief, at 7. Although the court terminated Father's parental rights to Child pursuant to sections 2511(a)(2), (5) and (8), Father's appeal addresses only section 2511(a)(2). **See** Appellant's Brief, at 7-9. **See also supra** n.4.

In cases involving termination of parental rights, "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child." **In re Z.P.**, 994

_____

. . .

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(2), (5) & (8).

A.2d 1108, 1115 (Pa. Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa. Super. 2009)). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (en banc) (internal citations omitted). On review, "we employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *Id.*

> Parental rights may be involuntarily terminated where any one subsection of [s]ection 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his . . . parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted).

Notably, the Agency has provided services for the past three years, yet Father frames his issue in terms of future ability. Father states he "believes the court erred in failing to consider [his] ability to remedy said incapacity in the near future." Appellant's Brief, at 9-10. This argument is meritless. Simply stated, Father is out of time. *See In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) ("Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.").

We also note that Father presented no evidence of a bond between Father and Child, and the Agency presented considerable evidence that Child is bonded with his foster family, an adoptive resource. **See** 23 Pa.C.S.A. § 2511(b). **See also In re J.N.M.**, 177 A.3d 937, 943-44 (Pa. Super. 2018) (stating that, in performing best-interest analysis pursuant to section 2511(b), trial court should consider parent-child bond, if any exists, safety needs of the child, intangibles, such as love, comfort, security, and stability child may have with current caregiver, and importance of continuing any relationship child may have with caregiver); **In re Z.P.**, **supra** (evidence was sufficient to establish father had no bond with child and remaining with foster parents or being adopted would serve child's best interests).

After our review, we find no abuse of discretion or error of law. **B.L.W.**, **supra**. Accordingly, we rely on Judge Gingrich's opinion to affirm the decree terminating his parental rights to Child, and we direct the parties to attach a copy of that opinion in the event of further proceedings. **See** Trial Court Opinion 5/24/21, at 12-13, 17-18) (finding Agency established clear and convincing evidence for terminating Father's parental rights pursuant to section 2511(a)(2); finding "no bond or attachment between [Child] and Father" and terminating Father's parent rights best serves Child's developmental, emotional, and physical needs pursuant to section 2511(b)).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/15/2022

IN THE COURT OF COMMON PLEAS OF MIFFLIN COUNTY, PENNSYLVANIA
ORPHAN'S COURT DIVISION

IN RE:                                    :        Parental Action No. 11 of 2020
                                          :
R.B.S. Jr.,                               :
a minor child.                            :
                                          :

## ORDER and OPINION

AND NOW, this 24ᵗʰ day of May, 2021, upon consideration of the Petition for Involuntary

Termination of Parental Rights, filed by Mifflin County Children and Youth Social Services Agency

(hereinafter "Agency") to terminate the parental rights of A███ B███ and R███ S███, Sr., it

is hereby ORDERED and DECREED said Petition is GRANTED.

## FACTUAL AND PROCEDURAL HISTORY

R.B.S. Jr. was born on December 1, 2010, and at the time of the termination here was ten (10)

years old. The natural mother of R.B.S. Jr. is A███ B███ (hereafter "Mother") and the natural father

of R.B.S. Jr. is R███ S███ Sr. (hereafter "Father). R.B.S. Jr. was adjudicated dependent, along

with his three (3) siblings on December 1, 2017. R.B.S. Jr.'s siblings have since returned to care of

Mother.

On November 19, 2017, Mother was arrested with three of her four children in the car with

her. Mother was arrested for driving with a suspended license, endangering the welfare of children,

possession of drug paraphernalia, driving under the influence of a controlled substance, driving

with operating privilege is suspended or revoked, general lighting requirements, and failure to use

a safety belt system. Father, on November 20, 2017, had tested positive for cocaine. The children,

1

including R.B.S. Jr., were taken into protective custody, and were all adjudicated dependent on December 1, 2017.

The Agency made parental objectives for Mother and Father. Mother's objectives were her protective capacity, meeting her mental health needs, ensuring medical, emotional, and physical needs are met, safe and stable housing, stable income, a drug free life, proper parenting, and agency cooperation. Father's objectives were similar to Mother's objectives. Case Supervisor, Nicole Patkalitsky, testified that Mother and Father have failed to alleviate any of the concerns that led to adjudication.

R.B.S. Jr. is the child subject to this termination. R.B.S. Jr. has a diagnosis of Post-Traumatic Stress Disorder (hereafter "PTSD"). R.B.S. Jr.'s mental health has deteriorated throughout the duration of this case. The underlying facts of R.B.S. Jr.'s PTSD are hard to discern. R.B.S. Jr. alleges that Father sexually abused him and his siblings, which has led to many of R.B.S. Jr.'s mental health issues throughout this case. These allegations were unfounded by the Agency. However, through extensive testimony, R.B.S. Jr. has witnesses, and potentially been subject to, domestic violence at the hands of his Father. Additionally, R.B.S. Jr. has special education services and an individualized education plan (hereafter "IEP") through the school. R.B.S. Jr. has significant mental health concerns, which has caused him to move placements three times during the course of this case. R.B.S. Jr. struggles with suicidal ideation, violent outbursts, and goes to trauma therapy weekly.

Testimony provided that Mother and Father had an incredibly tumultuous relationship. Mother testified that the relationship was abusive and co-dependent, and both Mother and Father

2

struggled with drug use. Additionally, there were allegations of physical and sexual abuse by Father toward both Mother and the children. Mother testified that it was very confusing to discern the truth of these statements. While Mother testified that she now believes there was sexual abuse, and that the children have since opened up to her about their experience (expect for R.B.S. Jr. as visitation was suspended which will be discussed below), Mother testified that the children often would tell her sexual abuse happened, and then quickly recant. However, when Mother found a suspicious substance in R.B.S. Jr.'s underwear, she did notify the Agency and take the child to the hospital. Mother testified that it confused her when the Agency deemed the allegations as unfounded, and then two of the children told her sexual abuse did not happen. However, Mother testified that one of her children is ready to come forward and pursue criminal action against Father, and that Mother now understands there was abuse and supports all of her children, including R.B.S. Jr. in receiving help. Father vehemently denies the allegations that he ever sexually abused his children, and no criminal charges have ever been filed against Father for the alleged sexual abuse of R.B.S. Jr. or his three siblings. The Agency, however, testified that not believing and supporting R.B.S. Jr.'s allegations from the beginning, and consistently throughout, points to Mother's lack of protective capacity, one of Mother's goals. Dr. Hennessy further testified that Mother not consistently believing R.B.S. Jr. has caused R.B.S. Jr. to be re-traumatized.

The Agency additionally had concerns that it took Mother such a long time to leave Father. Case workers testified that Mother would lie about having contact with Father, hid his belongings in her home, allowed the children access to Father, failed to obtain a Protection From Abuse, and

3

this all demonstrated her lack of protective capacity. Mother testified that these allegations from the Agency are not true. Mother stated that she worked with the Abuse Network and was guided to wait until Father was nearly out of jail before obtaining a PFA. Additionally, Mother kept Father's belongings in a shed away from the children, except for a television because Mother did not believe that a television would trigger the children. Mother testified she kept these belongings until she could find a third party to give the belongings back to Father. Additionally, Mother testified that the children never had access to get into contact with Father. Mother testified that while the children play on her phone the number to the jail Father was incarcerated in was blocked, and she only unblocked the jail number near the end of Father's incarceration to attempt to give his belongings to a third party, and promptly blocked the number again. Mother does believe that R.B.S. Jr. has been traumatized by the domestic violence in the home and the combined drug use of her and Father before Mother got sober.

The Agency took a large issue over Mother's alleged inconsistency and her alleged inability to tell the Agency the truth. The Agency also had extensive testimony about Mother's alleged inability to "buy in" to R.B.S. Jr.'s trauma. The Agency had Kristen Hennessy, Ph.D., licensed psychologist, testify to her time with R.B.S. Jr., as well as conversations with Mother. Dr. Hennessey testified that R.B.S. Jr. does not feel safe due to Mother's behaviors. Dr. Hennessey testified that she believes Mother is not consistent in believing that R.B.S. Jr. was traumatized by both Mother and Father. Dr. Hennessey testified that R.B.S. Jr. has very specific triggers and very volatile responses to triggers. R.B.S. Jr. has on previous occasions attempted to harm himself and his foster parents.

4

Some of the discussed triggers were images of Minnie Mouse (said to remind him of his biological sister), noise makers (which remind him of Father), and Zoom visitation (due to unfounded allegations that technology played a role in R.B.S. Jr.'s sexual assault). Visits with Father have been suspended since November 8, 2019, Mother's visits were suspended on December 17, 2019, and visitation with R.B.S. Jr.'s siblings was suspended on July 14, 2020.

There was extensive testimony over the suspended visitation. Father's visits were suspended due to the allegations of sexual abuse, and due to Father being incarcerated. Dr. Hennessy recommended suspending Mother's visitation after receiving information from R.B.S. Jr.'s placement at the time that when he was told about visits, he would have sexual and violent reactions. The incident Dr. Hennessy specifically outlined was when R.B.S. Jr. was told about a visit he began smacking his butt, attempting to stab his butt with chapstick, and then putting the chapstick in his mouth. This incident was followed by pushing his foster parents, stating he wanted to die, attempting to choke himself, and hurting his feet on a wall. During this incident, R.B.S. Jr. did say he wanted his Mother. Dr. Hennessy testified that R.B.S. Jr. is extremely conflicted about his feelings toward his Mother and that he does want to see her, he wants a relationship with her, but he does not feel safe in her care. Dr. Hennessy ultimately asked for suspended visitation with Mother because R.B.S. Jr. was having these violent outbursts, and she wanted him to settle into the foster home, learn how to manage his emotions before attempting to visit with Mother. Dr. Hennessy then recommended suspending visitation with R.B.S. Jr.'s siblings after the siblings were returned to Mother's home. In her letter recommending suspending visitation with the siblings, Dr. Hennessy

5

noted that R.B.S. Jr. was doing better but after the siblings had been returned to Mother's home, there became issues with the visits. Dr. Hennessy wrote that R.B.S. Jr. had reactions to how much the siblings spoke about Mother, and that he had been thinking about Mother more. He then asked to read the letter his Mother wrote him, which made him upset. The next day, R.B.S. Jr. was in such a state of crisis, he was in an inpatient facility. R.B.S. Jr. has not had contact with any family member since this time.

Dr. Hennessy testified that this arrangement should have been reassessed frequently, every thirty (30) to sixty (60) days, but that there was never a formal review of the suspended visitation. The Agency and Dr. Hennessey have set out tasks for Mother to complete even though visits were suspended which Mother did complete. One task was to get R.B.S. Jr. a gift, which Mother did. Testimony provided from Dr. Hennessey was that it was ultimately decided not to give the gift to R.B.S. Jr. because the gift "smelled" like Mother and Dr. Hennessey feared a triggered response from R.B.S. Jr. would occur. Additionally, there was testimony that Mother wrote two letters to R.B.S. Jr. after visits were suspended. Mother asked that the first letter not be shared, because Mother recognized there was language and phrasing in the letter that may trigger R.B.S. Jr. Afterward, Mother wrote a second letter which R.B.S. Jr. asked to be read to him. Dr. Hennessey testified that after she read the letter, R.B.S. Jr. had a negative reaction and became scared of Dr. Hennessey, as well as having a crisis that led him to inpatient care. Dr. Hennessy also testified that since suspended visits, R.B.S. Jr. has expressed desire to be with Mother, see Mother, or return to her care, but that he also does not feel safe with Mother, and expresses more desire to be adopted by his foster family.

6

Dr. Hennessey throughout this case has been concerned throughout the life of this case because Mother has been inconsistent with believing that trauma occurred and questions the validity of R.B.S. Jr.'s allegations. Dr. Hennessy also testified that she has never had a session with Mother, and does not know how Mother implemented the techniques that were needed to make R.B.S. Jr. feel safe. Finally, Dr. Hennessey testified that she has never had contact with Father, and that Father cannot even yet be mentioned in therapy without a negative reaction from R.B.S. Jr. Dr. Hennessey testified that she asked Father to write a letter taking responsibility for R.B.S. Jr.'s trauma and Father never did, which stalled progress she was able to make with R.B.S. Jr. reuniting with Father.

Additionally, the Agency had Mother undergo a psychological evaluation completed by David G. Ray, M. Ed. David Ray testified that Mother did have some inconsistencies between Agency reports, other counseling reports, and his evaluation. David Ray places a high value on the Agency's version of Mother throughout both his evaluation and his testimony. In his report dated April 28, 2020, his concerns were Mother's history of addiction, dysfunctional relationship, parenting abilities and protective capacity. David Ray ultimately diagnosed Mother with Personality Disorder.[1] David Ray noted that Mother has made very positive progress and had support groups in place. However, he had concerns over Mother's inconsistencies and poor decision making in the past. His concerns were over Mother's issues with the timeline of her drug usage, and reports from different agencies that contradicted what Mother reported to him. He noted that the

---

[1] The report notes that David Ray's diagnosis is different from Project Point of Light (another counseling service) that diagnosed her with codependency and drug addiction, not a personality disorder. David Ray disagrees with that diagnosis.

7

visits he observed with Mother and the children were actually very positive, albeit chaotic. His report indicates that R.B.S. Jr. does not have a healthy secure attachment to Mother, and that since visits were suspended his suicidal ideation had stopped. That testimony was in conflict with testimony presented by other witnesses. Overall, without evaluating R.B.S. Jr., and based on reports by Dr. Hennessey, he testified that R.B.S. Jr. was becoming more regulated. He's overall concern with Mother is her ability to remain consistent now that she has made progress, something he doubts can be achieved given his diagnosis of Mother having a personality disorder. David Ray ultimately recommended termination, and testified that because there was not a secure attachment with Mother, there would be minimal issues severing the bond between Mother and R.B.S. Jr. Father was asked by the Agency to have a psychological evaluation completed, but never did.

Multiple caseworkers testified in this case as well. Overall, there were concerns about Mother's drug use, consistency, honesty, and protective capacity. Caseworkers testified that they struggle with Mother because they do not feel that Mother follows their recommendations in this case. A majority of the testimony the caseworkers focused on events in 2018 and 2019, prior to Mother getting sober. The caseworkers testified that Mother could not model the proper behavior when visits were still occurring. There was testimony that not all the concerns were shared with Mother. For instance, Mother was unaware that R.B.S. Jr. had contracted coronavirus, that technology was a trigger for him because of the sexual abuse allegations, or that modeling that was initially shown to Mother was not effective for R.B.S. Jr. and that the modelled behavior had actually been changed. Additionally, there was testimony that the Agency was not happy, or very concerned,

8

when the Court told the Agency to increase visitation with Mother. It was after this time, that R.B.S. Jr. began having suicidal ideation, which Mother found confusing because R.B.S. Jr. had seemed to be improving. Testimony regarding Father was that he was generally uncooperative. While he participated in some of the classes while incarcerated, he did not continue that after he was released. Caseworkers said they generally did not have much contact with Father.

Mother testified, as well as some of her supports within the community. Ann Kanagy testified that she runs some of the support groups Mother is involved with. Mother sought out additional resources, above what the Agency set out for her. Ann Kanagy ran quite of few of these, which include a support group for single mothers. Ann Kanagy testified that she has seen a tremendous change in Mother throughout her time at the church these groups are run out of. Mother additionally testified that finding God and being involved with the church has been a very big reason that her life has been turned around. Mother testified that the most frustrating part of this case is that she felt she was never communicated with by both Dr. Hennessy and the Agency. While Mother testified she received the parenting plans and spoke with case workers, she said a lot of the information about R.B.S. Jr. was not told to her until there was a permanency review hearing before the Court. Specifically, Mother testified that she was not made aware of R.B.S. Jr.'s suicidal ideation until a Court hearing where testimony was presented. Mother was greatly concerned about R.B.S. Jr.'s treatment in this case as well. Mother testified that "things were going pretty well" for her and R.B.S. Jr. as she started to progress through her case. At the outset of this case, R.B.S. Jr. was being seen by a different therapist, and Mother said she saw an improvement. Mother testified that

9

without reason, R.B.S. Jr. was moved to Dr. Hennessey's practice, and that is when Mother began to notice a decline in this case, and things like R.B.S. Jr.'s violent outbursts and suicidal ideation began. Mother testified that this is something she discusses with her own therapist, and worries about re-traumatization with R.B.S. Jr. as his mental state continues to decline. Mother also testified that this case has been increasingly difficult because any time she asks for clarification on a decision the Agency or Dr. Hennessy makes, or a reason why decisions are being made, the Agency claims that she is not complying with recommendations and that Mother lacks protective capacity. Mother testified that she asked the Agency what an appropriate gift would be for R.B.S. Jr., and was given no guidance, so she picked out a Nike T-Shirt she thought he would like. Mother testified that she was never informed the gift was inappropriate and never told that the gift was not given to R.B.S. Jr. Additionally, Mother testified that the first letter she gave R.B.S. Jr. and asked not to be shared is because Mother put in "I'm fighting for you" and she thought that may trigger him and wanted to remove the phrase. After she removed that phrase, she believed that the letter was fine, and was not told otherwise.

Additionally, Mother also testified that it's been incredibly difficult to be involved with R.B.S. Jr.'s therapy. Mother testified that a majority of her contact with Dr. Hennessy has been by phone, and that she is not very informed of what she needs to be doing to help R.B.S. Jr.'s therapy. She met with Dr. Hennessy one time, and was informed that R.B.S. Jr. has an issue with his feet. She said the only thing Dr. Hennessy taught her was to massage his feet, give him socks, and talk to him in a very calm voice. However, prior testimony provided that calm voices do not work well with R.B.S.

10

Jr., nor does a maternal figure attempting to calm down R.B.S. Jr. immediately after a negative behavior, a fact Mother says she again, only learned during the hearing. Mother testified that it has been incredibly difficult to know what she needs to work on regarding R.B.S. Jr.'s mental health and how best to help him, because there is not a lot of communication about it.

Finally, the *Guardian Ad Litem* (hereafter "GAL") and R.B.S. Jr.'s legal counsel both presented findings to the Court. Both reported that this case is very difficult due to R.B.S. Jr.'s mental state. The GAL reported that R.B.S. Jr. in the latest placement is happy and safe, and has expressed interest in being adopted. However, the GAL also reported R.B.S. Jr. wants to see his siblings but is worried what his response may be. The GAL stated it is clear that the child wants to remain in his placement, but also that he wants a relationship with Mother and his biological siblings. The GAL also reported she is concerned by Mother's decision to drive which resulted in criminal charges for driving on a suspended license, because she believes that presented a backslide in Mother's progress. Additionally, R.B.S. Jr.'s legal counsel reported that the child has expressed a desire to be adopted. However, R.B.S. Jr. does not seem to understand what termination means, and has expressed a desire to see his siblings. Ultimately, the GAL recommended termination, but R.B.S. Jr.'s legal counsel could not make a recommendation either way.

## DISCUSSION

The Court begins the discussion with noting that this case is highly complicated. There has been a tremendous level of progress by Mother in this case, during the second half of placement. The Court notes that if the Court did not find that Mother had made sustained and successful

11

progress, the Court would not have returned the three (3) siblings of R.B.S. Jr. to Mother's care. While a majority of testimony was presented on Mother's misgivings, the Court feels that this case comes down to the PTSD and mental health of R.B.S. Jr. rather than any lack of progress Mother has made while working towards reunification.

The court must undergo a two-step analysis when deciding whether to terminate an individual's parental rights. First, the court must determine whether the petitioner proved with clear and convincing evidence one of the grounds for termination stated in 23 Pa.C.S.A. § 2511(a). Next, the court must assess the child's developmental, physical, and emotional needs and welfare in accordance with 23 Pa.C.S.A. § 2511(b) and the best interest of the child standard. The court must consider each case's individual circumstances and the parent's explanations to determine whether the "totality of the circumstances" justifies terminating the parent's rights. *In re B.N.M.*, 856 A.2d 847, 853 (Pa. Super. 2004).

The Agency alleges grounds for termination under 23 Pa.C.S.A. §§ 2511(a)(2), 23 Pa.C.S.A. 2511(a)(5), and 23 Pa.C.S.A. § 2511(a)(8). The Court will first address the termination grounds found in all alleged sections. Then it will separately determine whether terminating Father and Mother's parental rights serves R.B.S. Jr.'s best interest.

I.    Termination Grounds for Father

A. Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(2)

Section 2511(a)(2) authorizes the court to terminate a parent's rights if:

> "The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or

12

subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."

23 Pa. C.S.A. § 2511(a)(2).

The Agency has established, by clear and convincing evidence, the grounds for termination of Father's parental rights under § 2511(a)(2). Father has not cooperated with the Agency in any meaningful way which has caused R.B.S. Jr. to be without essential parental care. Father has had numerous opportunities to be involved with services and has flouted almost every opportunity. This has caused R.B.S. Jr. to be without essential parental care, control or subsistence necessary for his physical and mental well-being. Furthermore, Father's incapacity cannot be remedied in a timely manner, as evidenced by his unwillingness to participate in this case meaningfully. 23 Pa.C.S.A. §2511(a)(2).

B. Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(5)

Section 2511(a)(5) permits the court to terminate parental rights when:

"The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child."
23 Pa.C.S.A. § 2511(a)(5).

The Agency has established, by clear and convincing evidence, the grounds for termination of Father's parental rights under § 2511(a)(5). Father has not cooperated with the Agency in any

13

meaningful way which has caused R.B.S. Jr. to be without essential parental care. Father has failed to address the Agency's mental health concerns, failed to seek drug and alcohol treatment for his addiction, failed to maintain a crime free lifestyle which resulted in Father being incarcerated three (3) times during the life of this case. Father has had numerous opportunities to be involved with services and has flouted almost every opportunity. This has caused R.B.S. Jr. to be without essential parental care, control or subsistence necessary for her physical and mental well-being. Furthermore, Father's incapacity cannot be remedied in a timely manner, as evidenced by his unwillingness to participate in this case meaningfully. 23 Pa.C.S.A. §2511(a)(2).

C. Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(8)

The court may terminate a parent's parental rights under § 2511(a)(8) if:

> "The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would serve the needs and welfare of the child."

23 Pa.C.S.A. § 2511(a)(8).

The Agency by clear and convincing evidence also established the termination grounds found in § 2511 (a)(8). At the time of the hearing, R.B.S. Jr. had been in foster care for approximately thirty-right (38) months. Father has clearly failed to address any of the problems that led to R.B.S. Jr. being removed from the home. Father has failed to address the Agency's mental health concerns, failed to seek drug and alcohol treatment for his addiction, failed to maintain a crime free lifestyle which resulted in Father being incarcerated three (3) times during the life of this case, and failed to

14

cooperate with the Agency in any meaningful way. It is apparent to the Court that Father will not cooperate with the Agency and work on any of the concerns the Agency has. As such, the Court finds grounds to terminate Father's parental rights pursuant to § 2511 (a)(8).

## II. Termination Grounds for Mother

### A. Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(2)

Section 2511(a)(2) authorizes the court to terminate a parent's rights if:

> "The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."

23 Pa. C.S.A. § 2511(a)(2).

Here, the Agency by clear and convincing evidence established the termination grounds found in § 2511(a)(2), relative to Mother. Irremediable incapacity by Mother has caused R.B.S. Jr. to be without essential parental care for his mental wellbeing and conditions cannot be remedied. The abuse of R.B.S. Jr. caused such trauma that Dr. Hennessy recommended no contact with Mother, as it causes R.B.S. Jr. continued trauma and concerns of self-harm. This initial incapacity caused R.B.S. Jr. to be without essential parental care for his wellbeing and according to the expert testimony of Dr. Hennessy, there conditions continue to exist as the triggers are Mother's home, Mother's family, and Mother's presence. Accordingly, the Court finds grounds to terminate Mother's parental rights pursuant to § 2511(a)(2).

### B. Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(5)

15

Section 2511(a)(5) permits the court to terminate parental rights when:

"The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child."

23 Pa.C.S.A. § 2511(a)(5).

The Agency by clear and convincing evidence also established the termination grounds found in § 2511(a)(5). At the time of the hearing, R.B.S. Jr. had been in foster care for approximately thirty-eight (38) months. The conditions, by way of R.B.S. Jr.'s triggers, continue to exist. Per the expert testimony of Dr. Hennessey the conditions continue to exist, and Mother cannot remedy due to the nature of the abuse and ongoing trauma of R.B.S. Jr. While Mother has made progress in almost every area of her life, R.B.S. Jr.'s extensive trauma cannot be remedied in Mother's care, per expert testimony of Dr. Hennessy. While it is clear that Mother does love R.B.S. Jr. very much, and has worked hard to address the problems that led to the placement of R.B.S. Jr., R.B.S. Jr.'s trauma is intrinsically linked to Mother, and seems unlikely to be resolved. As such, the Court finds grounds to terminate Mother's parental rights pursuant to § 2511(a)(5).

C. Termination Pursuant to 23 Pa.C.S.A. § 2511(a)(8)

The court may terminate a parent's parental rights under § 2511(a)(8) if:

16

"The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would serve the needs and welfare of the child."

23 Pa.C.S.A. § 2511(a)(8).

The Agency by clear and convincing evidence also established the termination grounds found in § 2511 (a)(8). At the time of the hearing, R.B.S. Jr. had been in foster care for approximately thirty-eight (38) months. R.B.S. Jr.'s continued trauma and extensive triggers linked to Mother's care continue to exist. While Mother has attempted to remedy the trauma caused to R.B.S. Jr., testimony provided by Dr. Hennessy shows that R.B.S. Jr. is still not safe in Mother's care, and the trauma continues to exist. Termination of Mother's rights would best serve the needs and welfare of R.B.S. Jr. As such, the Court finds grounds to terminate Mother's parental rights pursuant to § 2511 (a)(8).

## III. The Child's Best Interests

Having found the Agency established with clear and convincing evidence the termination grounds for Mother and Father stated in § 2511(a)(2), § 2511(a)(5) and§ 2511(a)(8), the Court must determine whether terminating parental rights serves R.B.S. Jr.'s best interest. The court must give "primary determination" to the child's "developmental, physical, and emotional needs." 23 Pa.C.S.A. § 2511(b). This analysis involves an examination of "intangibles such as love, comfort, security, and stability." *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006). The court must assess the bond the children have with their parents and whether termination would sever "existing,

17

necessary, and beneficial relationship[s]." *In re K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008)(citing *In re. C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000). The court must pay "close attention" to the effect severing the bond with a parent has on the children. *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). However, the child's needs and welfare are the most important factors. *In re K.Z.S.*, 946 A.2d at 760.

The Court finds that there is no bond or attachment between R.B.S. Jr. and Father. In fact, testimony provided by all parties indicated that there is a severe trauma response to Father. The Court finds that R.B.S. Jr.'s needs and welfare are best met with terminating Father's parental rights.

The Court acknowledges that Mother loves R.B.S. Jr. and does want him returned to her care. The Court also takes notice that Mother has worked exceptionally hard to dramatically change her life. However, R.B.S. Jr. does have mental health concerns that Mother has not been able to address given the severity of R.B.S. Jr.'s symptoms. While R.B.S. Jr. is confused and does not fully understand what termination is, as reported by both his legal counsel and the GAL, the Court finds that R.B.S. Jr.'s mental condition appears to be more stable in his foster home, than in the care of Mother. Further, there was testimony presented that while there is a bond between Mother and R.B.S. Jr., that bond is not a safe, secure bond, but rather a trauma bond. Therefore, the Court finds that terminating Mother's parental rights serves R.B.S. Jr.'s developmental, physical, and emotional needs and welfare.

## CONCLUSION

This Court finds the Agency met its burden, by proving through clear and convincing evidence the grounds for involuntary termination of Mother and Father's parental rights found in

18

23 Pa.C.S.A. §§2511(a)(2), 2511(a)(5), and 2511(a)(8). Further, terminating Mother and Father's parental rights is in the best interests of R.B.S. Jr.

BY THE COURT:

AARON L. GINGRICH
JUDGE

C:     Alina Reed, Esq.
Karen Muir, Esq.
Jeffrey M. Davis, Esq.
Erica Shoaf, Esq.
Brian Baker, Esq.
MCCYS
File

19